IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| HENRY KEVIN CROWE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 7:11-CV-3208-SLB |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

The plaintiff, Henry Kevin Crowe, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying his application for supplemental security income.  Plaintiff timely pursued and exhausted his administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g).  Based on the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be affirmed.

### I. STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied.  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  To that end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and

supported by substantial evidence." Bloodsworth, at 1239 (citations omitted). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth, at 1239. This court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). Even if the court finds that the evidence preponderates against the Commissioner's decision, the court must affirm the Commissioner's decision if it is supported by substantial evidence. Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003).

## II. STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish entitlement for a period of disability, a claimant must be disabled. The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i). For the purpose of establishing entitlement to disability benefits, "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, the Social Security regulations outline a five-step sequential process. 20 C.F.R. § 404.1520 (a)-(f). The Commissioner must determine in sequence:

(1) whether the claimant is currently employed;

(2) whether she has a severe impairment;

(3)     whether her impairment meets or equals one listed by the Secretary;

(4)     whether the claimant can perform her past work; and

(5)     whether the claimant is capable of performing any work in the national economy.

Pope v. Shalala, 998 F.2d 473, 477 (7th Cir. 1993); accord McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if [he] suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform [his] past work, the burden shifts to the [Commissioner] to show that the claimant can perform some other job." Pope, at 477; accord Foot v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).

In the present case, the ALJ determined the plaintiff met the first two steps, but concluded he did not suffer from a listed impairment. The ALJ found the plaintiff was capable of performing his past relevant work as a security guard and cashier. R. 28. Accordingly, he found the plaintiff was not disabled.

### III. FACTUAL BACKGROUND

The plaintiff filed an application for supplemental security income with an amended alleged disability onset date of August 7, 2009. R. 15. The plaintiff alleges he is disabled primarily due to anxiety and depression.

Treatment notes from Dr. Collins at the Maplesville Clinic show that the plaintiff received refills of his medications during the 12 months prior to his alleged onset of disability. On July 31, 2009, Dr. Collins' treatment note indicates the plaintiff had "no complaints." R. 260.

On September 18, 2008, the plaintiff was seen by Dr. Baltz at the Cahaba Center for Mental Health ("CCMH") with a generalized anxiety disorder and secondary depression. The plaintiff reported that without his medications he was "pretty anxious."  R. 296.  He reported some problems with his memory.  R. 296.  On his mental status examination Dr. Baltz noted the plaintiff to be "somewhat anxious looking."  R. 296.  The plaintiff admitted to occasional thoughts of hurting himself but stated he had no plans to do so.  R. 296.  Dr. Baltz's diagnostic impression was:

   1)  Generalized anxiety disorder.
   2)  Gender identity issues.
   3)  Secondary depression.
   4)  Old history of alcohol abuse.

R. 296.  The plaintiff's medications were Lexapro and clonazepam.  R. 296.  Dr. Baltz recommended "part time working maybe two eight[-]hour shifts per week to give him some structure and purpose."  R. 296.  The plaintiff was instructed to return to care in four months. R. 296.

On January 12, 2009, the plaintiff saw Dr. Baltz reporting he had gained weight and did "not have any will to enjoy anything."  R. 295.  On his mental status examination the plaintiff reported feeling "more depressed lately."  R. 295.  The plaintiff also admitted to occasional thoughts of hurting himself.  R. 295.  Dr. Baltz changed the plaintiff's diagnosis of secondary depression to Depressive Disorder NOS and added Wellbutrin to the plaintiff's medications.  R. 295.  On January 23, 2009, the plaintiff called Dr. Baltz's office reporting that Wellbutrin had caused increased anxiety and other side effects.  R. 294.  Dr. Baltz discontinued the plaintiff's Wellbutrin.  R. 294.

On May 7, 2009, the plaintiff reported his mood had been "on and off" and that he had more bad days than good days." R. 293.  He also reported feeling scared and somewhat paranoid a couple of times per week.  R. 293.  Dr. Baltz noted the plaintiff denied wanting to hurt himself or others.  R. 293.  The plaintiff's diagnoses remained the same.  R. 293.  Dr. Baltz prescribed Ariprazole to treat the plaintiff's "vague paranoia and to augment his antidepressant."  R. 293.  Propranolol was prescribed on an as needed basis for rapid heart rate and tremor.  R. 293.  The plaintiff was to return to care in four months.  R. 293.

On September 24, 2009, the plaintiff received individual therapy at CCMH.  The therapist indicated the plaintiff was anxious but not dysphoric.  R. 292.  The therapist also indicated the plaintiff had no side effects from medications.  R. 292.  It was reported the plaintiff was frustrated.  R. 292.  The therapist assessed a GAF score of 70.[1]  R. 292.

On October 29, 2009, the plaintiff's therapist indicated he was not anxious and his mood was euthymic.  R. 291.  The therapist indicated the plaintiff had no side effects from his medications.  R. 291.  The therapist indicated the plaintiff should continue what he had been doing (keeping busy and not being around other people) because it was working.  R. 291.  The therapist assessed a GAF score of 75, noting the plaintiff enjoyed feeling good.[2]  R. 291.

---

[1] The Global Assessment of Functioning (GAF) Scale is used to report an individual's overall level of functioning. Diagnostic and Statistical Manual of Mental Disorders 30 (4th Edition) ("DSM-IV").  A GAF of 61-70 indicates: "**Some mild symptoms** (e.g., depressed mood and mild insomnia), **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, with some meaningful interpersonal relationships**." DSM-IV at 32 (emphasis in original).

[2] A GAF score of 71-80 indicates: "**If symptoms are present, they are transient and expectable reactions to psychosocial stressors** (e.g., difficulty concentrating after family argument); **no more than slight impairment in social, occupational, or school functioning**

(continued...)

On November 30, 2009, the plaintiff's therapist indicated the plaintiff was anxious and mildly dysphoric. R. 290. His therapist indicated the plaintiff had no side effects from medications. R. 290. The plaintiff reported that he had an anxiety attack due to stress caused by his brother, and he also reported a rough month dealing with holiday stress. R. 290. His therapist assessed a GAF score of 70. R. 290.

The plaintiff saw Dr. Baltz on December 21, 2009. Dr. Baltz reported the plaintiff had gained about 20 pounds after he was placed on Abilify seven months previously. R. 334. The plaintiff reported that, if failed to take his Abilify, clonazepam, and Lexapro, he would return "to his old self of being anxious and worried." R. 334. Dr. Baltz noted the plaintiff reported he was feeling better and denied wanting to hurt himself or others. R. 334. The treatment plan was to discontinue Abilify and to try Geodon. R. 334.

On January 5, 2010 the plaintiff reported that, since starting Geodon, he experienced problems with leg movement when he was lying down. R. 333. He also reported a slight hand tremor. R. 333. The plaintiff's report was forwarded to Dr. Baltz, who added a prescription for Artane. R. 333.

On May 2, 2010, the plaintiff presented at the Vaughan Regional Medical Center ER complaining of an "anxiety attack after drinking [a] 6[-]pack of beer and forgetting to take his Klonopin." R. 369. The plaintiff was given medications and released. R. 371.

On May 20, 2010, the plaintiff saw Dr. Baltz, who reported the plaintiff had lost 20 pounds after he had discontinued Abilify. R. 332. Dr. Baltz noted the plaintiff had not

---

[2] (...continued)
(e.g., temporarily falling behind in school work). DSM-IV at 32 (emphasis in original).

tolerated Artane, which caused loss of vision because of dilation of his pupils. R. 332. The plaintiff reported Geodon had reduced his nervousness and paranoia. R. 332. Amantadine was added to the plaintiff's medications and he was to continue taking Geodon. R. 332.

On June 23, 2010, the plaintiff saw his therapist at CCMH. He reported that he did not feel his medications were working. R. 330. The therapist indicated the plaintiff's psychiatrist would be consulted about changes in his medications. R. 330. The therapist gave the plaintiff a GAF score of 52.[3] R. 330. The therapist noted the plaintiff was verbal and able to initiate topics. R. 330. The plaintiff's therapist initiated a request to Dr. Baltz concerning the plaintiff's complaints about his medications. R. 331. The request indicated the plaintiff was feeling worried and anxious, and he believed that Geodon was the cause. R. 331. As a result, Dr. Baltz reduced the plaintiff's Geodon dosage. R. 331.

Also on June 23, 2010, there is a CCMH report of an emergency phone contact with the plaintiff, who again reported his medications were not working. R. 329. The plaintiff was encouraged to go to the emergency room but he refused. R. 329. The note states the plaintiff was allowed to vent and the responder provided positive feedback. R. 329. It also states the plaintiff sounded intoxicated, but that he denied it. R. 329.

The plaintiff saw his therapist at CCMH on July 15, 2010. His therapist indicated the plaintiff was dysphoric but not anxious. R. 328. The therapist indicated the plaintiff had no side effects from his medications. R. 328. However, the notes state the plaintiff was taking his

---

[3] A GAF score of 51-60 reflects: "**Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers.)" DSM-IV-TR at 34 (emphasis in original).

medications and that reducing the Geodon dosage helped.  R. 328.  The note states the plaintiff was better able to function and was less anxious.  R. 328.  The plaintiff's therapist gave him a GAF score of 55.  R. 328.

On July 18, 2010, the plaintiff made an emergency phone contact with CCMH.  The plaintiff reported he was "not doing well – I feel like hurting somebody."  R. 327.  The note states the plaintiff was allowed to vent and was offered support.  R. 327.  The responder gave the plaintiff alternatives to actions that would get him in trouble.  R. 327.  The note states the plaintiff seemed to be intoxicated.  R. 327.  It was recommended the plaintiff contact his therapist in the morning.  R. 327.

The plaintiff saw his therapist on August 12, 2010.  His therapist indicated the plaintiff was dysphoric at home but euthymic on days he had therapy.  R. 326.  The plaintiff was not noted to be anxious.  R. 326.  It was noted the plaintiff continued to take his medications, which were helping some.  R. 326.  The therapist gave the plaintiff a GAF score of 55.  R. 326.  There is also a CCMH emergency phone contact record on the same date.  The plaintiff reported extreme anxiety and problems being able to get over a fight he had two and one-half months previously with a friend.  R. 325.  The note states the plaintiff "was under the influences of alcohol and/or some other intoxicating drug."  R. 325.  The plaintiff was to contact his therapist in the morning and keep his scheduled appointments.  R. 325.

On August 23, 2010, a request for medication adjustment was made to Dr. Baltz by the plaintiff's therapist.  R. 324.  This request was because the plaintiff reported feeling bad and unable to sleep because of Geodon.  R. 324.  The plaintiff reported that he did better on Abilify.

R. 324.  Dr. Baltz approved discontinuation of Geodon and prescribed Abilify.  R. 324.  This is the last mental health treatment note in the record.

There are also treatment notes documenting various physical problems, including elbow tenderness and psoriasis on January 28, 2010, and a mouth lesion resulting from an assault in a bar on July 2, 2010.  R. 337-38.  But the plaintiff does not argue on appeal that these physical problems cause him to be disabled.

## IV.  DISCUSSION

### A.

Plaintiff's first argument on appeal is that the ALJ failed to properly consider the opinion of Dr. Blanton, the Commissioner's consultative psychological examiner, who examined the plaintiff on October 22, 2009.  The plaintiff argues the ALJ should have credited Dr. Blanton's report, in which he gave the plaintiff a GAF score of 50.[4]  The vocational expert (VE) testified that an individual with a sustained GAF score of 50 would be unable to work.  When asked whether a GAF of 50 would exclude all work, the VE replied as follows:

> Yes, it would.  Again, under the assumption that that's a prolonged GAF score as opposed to on one particular day when he was having a bad day.  That would be the difference.  GAF score is like a photograph.  It's kind of like that's where he was that day.

R. 57.  The ALJ asked the VE to assume the plaintiff "had a 50 GAF score for every month since the amended onset date."  R. 58.  The VE testified that in that event the plaintiff would

---

[4] A GAF of 41-50 indicates:  "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **or any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)."  DSM-IV at 32 (emphasis in original).

9

not be able to perform any jobs. R. 58. He explained that the sustained and continuing GAF score was the critical factor. R. 58.

In determining how much weight to give to each medical opinion, the ALJ must consider several factors including: (1) whether the doctor has examined the plaintiff; (2) whether the doctor has a treating relationship with the plaintiff; (3) the extent to which the doctor presents medical evidence and explanation supporting his opinion; (4) whether the doctor's opinion is consistent with the record as a whole; and (5) whether the doctor is a specialist. C.F.R. §§ 404.1527(c), 416.927(c). The ALJ gave little weight to Dr. Blanton's psychological evaluation. He found Dr. Blanton's report "fails to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled, and the doctor did not specifically address this weakness." R. 27. The ALJ noted Dr. Blanton "did not have the benefit of reviewing all other medical reports contained in the current record," and that his "opinion contrasts sharply with the other evidence of record, which renders it less persuasive." R. 27. In his decision the ALJ discussed treatment notes from CCMH. These notes show that, at about the time of Dr. Blanton's evaluation, the plaintiff's treating therapist assessed much higher GAF scores. On September 24, 2009, the therapist assessed a GAF score of 70. R. 292. On October 29, 2009, plaintiff's treating therapist assessed the plaintiff with a GAF score of 75, and it was noted the plaintiff was "enjoying feeling good." R. 291. On November 30, 2009, plaintiff's treating therapist gave the plaintiff a GAF score of 70. R. 290. The ALJ specifically mentioned each of these GAF scores in his decision. R. 21-22. These scores were assessed by a therapist with an ongoing treating relationship with the plaintiff. Dr. Blanton did not have access to these treatment notes when

he evaluated the plaintiff. These treatment notes provide substantial evidence to support the ALJ's decision to give Dr. Blanton's report and GAF score little weight. Therefore, the ALJ properly evaluated Dr. Blanton's report under the appropriate legal standards, and his decision to give Dr. Blanton's report little weight is supported by substantial evidence.

**B.**

The plaintiff also argues the ALJ improperly ignored the initial medical opinion provided by Dr. Ravello, the State agency reviewing psychologist. An ALJ must consider the findings of a state agency medical or psychological consultant, who is considered an expert, and must explain the weight given to such findings in the same way as with other medical sources. See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). The plaintiff argues Dr. Ravello's opinion supports Dr. Blanton's report. Although Dr. Ravello's initial opinion, given on November 18, 2009, stated the plaintiff appeared quite disabled based upon Dr. Blanton's mental status examination, Dr. Ravello requested that additional treatment records be obtained. R. 288. After reviewing those records, Dr. Ravello rendered her final opinion as to the plaintiff's mental impairments on December 18, 2009. In her mental summary, Dr. Ravello found the treatment notes did not support Dr. Blanton's notation of psychotic features. R. 316. She also concluded Dr. Blanton's mental status examination revealed "at the most moderate limitations in [plaintiff's] concentration, persistence and pace." R. 303. Dr. Ravello found Dr. Blanton's report and the plaintiff's activities of daily living supported "at the most moderate limitations in his personal care and daily living skills and in his ability to relate to others." R. 303. Therefore, Dr. Ravello's final medical opinion does not support Dr. Blanton's assessment. The ALJ did not ignore Dr. Ravello's opinions. Instead, he discussed Dr.

Ravello's opinions in detail, R. 21-23, and found her mental summary "supports a finding of 'not disabled.'" R. 27. The ALJ noted Dr. Ravello "provided specific reasons for [her] opinions indicating the opinions were grounded in the evidence of record." R. 27. The ALJ's decision to give little weight to Dr. Ravello's initial opinion, rendered before she reviewed the plaintiff's updated treatment records, is supported by substantial evidence.

### C.

The plaintiff's third argument is that the ALJ did not evaluate every medical opinion contained in the record as required under 20 C.F.R. § 416.927. The regulations define medical opinions as follows:

> Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. § 416.927(a)(2). The plaintiff asserts "the medical opinions expressed by Dr. Ravello, Dr. Baltz, Dr. Collins, and Dr. Blanton further support the fact that [the plaintiff] would be unable to perform light work with exceptions, as the ALJ found." Pl.'s Br. 11. Although the plaintiff points to a number of treatment notes containing diagnoses, prescriptions, and reports of medication side effects by the plaintiff, he does not identify any opinion from a treating source about how his mental impairment impacted his ability to work. The mere diagnosis of a condition, without proof of any functional limitations imposed by that condition, is insufficient to prove disability. See, Johns v. Bowen, 821 F.2d 551, 555 (11th Cir. 1987) (finding the mere diagnosis of polymyalgia rheumatica says nothing about why the condition makes it impossible for the claimant to be gainfully employed); McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986) ("[T]he 'severity' of a medically ascertained disability

must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality.").

As discussed above, the ALJ gave reasons supported by substantial evidence for rejecting the opinions from Drs. Blanton and Ravello relied upon by the plaintiff.  The ALJ's decision also contains an extensive discussion of the treatment records, showing he considered all of the medical evidence.  While the ALJ did not specifically discuss the weight he gave to each and every treatment note, "[t]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (holding an ALJ is not required to specifically refer to every piece of evidence so long as the opinion shows the claimant's medical condition as a whole was considered).  Therefore, plaintiff's argument that the ALJ did not evaluate every medical opinion contained in the record as required under 20 C.F.R. § 416.927 is without merit.

### D.

The plaintiff's final argument on appeal is that the ALJ improperly rejected his testimony concerning the limitations imposed by his combined medically determinable impairments.  In this circuit, "a three part 'pain standard' [is applied] when a claimant seeks to establish disability through his or her own testimony of pain or other subjective symptoms." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995)

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

Id. (quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). If an ALJ discredits a claimant's subjective complaints, he must give "explicit and adequate reasons" for his decision. See id. at 1561-62. "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." Id. at 1562. The ALJ's credibility determination need not cite "particular phrases or formulations" as long as it enables the court to conclude that the ALJ considered the plaintiff's medical condition as a whole. See Dyer v. Barnhart, 395 F.3d 1206, 1210-11 (11th Cir. 2005) (citing Foote, 67 F.3d at 1561).

The ALJ summarized the plaintiff's testimony as follows:

> With regard to generalized anxiety disorder/depressive disorder, NOS, the claimant said that he goes to Cahaba Mental Health and he sees Dr. Baltz. He said that his worse [sic] problem is anxiety, stress, and panic attacks. He averaged 1-2 panic attacks per week. With depression, he has crying spells for no reason. This happens twice a week. He said that he has no contact with anyone but his mother.

R. 26. The ALJ found the plaintiff's testimony was not credible for the following reasons:

> The undersigned finds these impairments to be non-disabling per testimony of the claimant that medications help. When seen at Cahaba Center for Mental Health the claimant reported medications help (Exhibit 14 F). He also told Dr. Blanton that he is taking Abilify, Lexapro, and Propranonol [sic] and these medications are helping him (Exhibit 7F). With continued psychiatric medication adjustments and treatment, he has improved. Furthermore, the claimant has not required any recent emergency room visits, psychiatric hospitalizations, or psychotropic medications.

R. 27.

The medical records support the ALJ's conclusion that the plaintiff's mental symptoms were not disabling with medication therapy. In late 2009 the plaintiff received GAF scores of 70, 75, and 70 when he saw his therapist between September 24, 2009, and November 30, 2009. When the plaintiff saw his treating psychiatrist, Dr. Baltz, on December 21, 2009, he

reported he was feeling better on his current medications.  R. 334.  He told Dr. Baltz that without his medications he would return "to his old self of being anxious and worried."  R. 334.  However, due to weight gain the plaintiff was taken off Abilify and placed on Geodon.  R. 334.

The plaintiff's medications continued to be adjusted to relieve side effects caused by Geodon through August 2010.  On May 20, 2010, the plaintiff reported Geodon had reduced his nervousness and paranoia.  R. 332.  During the summer of 2010 the plaintiff's therapist assessed GAF scores of 52, 55 and 55.  During that time the plaintiff appeared intoxicated on three calls to the CCMH crisis line when he complained his medications were not working.  The final treatment note in the record indicates the plaintiff would be taken off Geodon and placed back on Abilify.  R. 324.  Therefore, even during a period in which the plaintiff complained that Geodon was not working, his treating therapist assessed GAF scores indicating only moderate symptoms.

The plaintiff also told Dr. Blanton, the consultative mental examiner, that his medications were helping him.  R. 285.  He reported only "mild anxiety" to Dr. Blanton after taking his medications one hour before the evaluation.  R. 286.  This provides further evidence to support the ALJ's credibility finding.

When the plaintiff went to the emergency room on May 2, 2010, he had not been compliant with his medication therapy.  At that visit, he complained of an "anxiety attack after drinking [a] 6 pack of beer and forgetting to take his Klonopin."  R. 369.

The ALJ properly considered the plaintiff's medical condition as a whole in finding his allegations of disabling symptoms not credible.  His finding that the plaintiff's mental

symptoms were reduced to a non-disabling level with medication therapy is supported by substantial evidence. Therefore, the ALJ properly discredited the plaintiff's testimony.

## V. CONCLUSION

The court concludes the ALJ's determination that the plaintiff is not disabled is supported by substantial evidence, and that the ALJ applied the proper legal standards in arriving at this decision. Accordingly, the Commissioner's final decision is due to be affirmed. An appropriate order will be entered contemporaneously herewith.

**DONE**, this 30th day of September, 2013.

*Sharon Lovelace Blackburn*
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE